UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
2012 MAY 17  AM 11: 49
LORETTA G. WHYTE
CLERK

| | |
|---|---|
| 2002 JBO TRUST NO. 1 and | |
| JOHN BREWSTER OHLE, III | *    CIVIL ACTION NO. |
| *Plaintiffs* | * |
| | * |
| VERSUS | *    **12-1282** |
| | *    MAG.    SEC. " " |
| | * |
| AMERICAN EXPRESS CO., | * |
| AMERICAN EXPRESS TAX and BUS. | *    **SECT. L  MAG. 3** |
| SERVICES, INC. n/k/a RSM MCGLADERY, LLC, | * |
| ROBERT GOLDSTEIN, KURT ANDERSON AND | * |
| JENKENS & GILCHRIST, P.C. | * |
| *Defendants* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiffs, 2002 JBO Trust No. 1 ("JBO Trust") and John Brewster Ohle, III ("Ohle")

(sometimes collectively referred to as the "Plaintiffs") bring this action against Defendants American

Express Company, ("Amex Company"), American Express Tax and Business Service, Inc., now

known as RSM McGladrey LLC ("Amex"), Robert Goldstein ("Goldstein"), Kurt Anderson

("Anderson"), Jenkens and Gilchrist, P.C. ("Jenkens"), (all preceding defendants are sometimes

collectively referred to as the "Defendants"), seeking damages for claims arising out of the reporting

of income tax consequences of certain investments and other causes of actions more fully described

herein, and state:

### I. JURISDICTION AND VENUE

1.     This court has jurisdiction over this civil action pursuant to 18 U.S.C. 1964(a) and

1964( c), and 28 U.S.C. 1331 et seq. and 1337.  This is a civil action arising under 18 U.S.C. 1961-

1968, 901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known

as the Racketeer influenced and Corrupt Organization Act ("RICO"), and in particular, under 18

U.S.C. 1964 and other causes of action as set forth hereafter.  This Court has supplemental

jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. 1367.

2.     Venue lies in this District pursuant to 18 U.S.C. 1391. As set forth herein, Defendants at all material times conducted substantial business within the Eastern District of Louisiana and the Plaintiff JBO Trust is domiciled in the Parish of Orleans.

3.     This Court has personal jurisdiction over each of the Defendants.  Each of the Defendants transacted business in St. Tammany Parish and/or Orleans Parish and has sufficient minimum contacts in order to invest this Court with jurisdiction.

## II. PARTIES

4.     Plaintiff, 2002 JBO Trust No. 1 is a Louisiana grantor trust, domiciled in Orleans Parish.

5.     Plaintiff, John Brewster Ohle, III is a resident of Illinois and grantor of the JBO Trust.

6.     Defendant, American Express Company is a global travel, financial and network services provider and is both a member and is traded on the New York Stock Exchange. At the time of the events in question, the company had three operating segments, one of which was American Express Financial Advisors (AEFA), and over 78,000 employees.  AEFA was one of the leading financial planning companies in the United States, with over 12,000 financial advisors nationwide. AEFA offered a wide range of products and services, including financial planning, brokerage services, mutual funds, insurance and other investment products.

7.     Defendant, American Express Tax and Business Services, Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Upon information and belief, Amex is licensed to do business in this state and has conducted business in Louisiana sufficient to establish minimum contacts within the State that support the exercise of jurisdiction over it by this Court. Amex was involved in the tax reporting of transactions that form the basis for

the claims alleged herein. Among other things, Jenkens arranged for Amex to prepare the JBO Trust and Ohle tax returns for 2002 as well as tax returns for other participants in the Jenkens tax shelter transaction known as "HOMER". Upon information and belief, Amex may be served through its counsel, Lynne Uniman, Andrew Kurth LLP, 450 Lexington Avenue, New York, NY 10017. In August 2005, RSM McGladrey acquired Amex. Amex is now known as RSM McGladrey LLC.

8.     Upon information and belief, Defendant Robert Goldstein is an individual and resident of Florida. At the time of the events in question, Goldstein was a partner, employee, representative or agent of Amex.

9.     Upon information and belief, Kurt Anderson is an individual and resident of Illinois. At the time of the events in question, Anderson was an employee, representative or agent of Amex.

10.     At the time of the events in question, Defendant Jenkens & Gilchrist, P.C. was a large law firm with over six hundred (600) attorneys and offices in nine (9) major cities throughout the United States, including Chicago, Illinois. It claimed expertise in a variety of industries and market segments, including anti-trust, bankruptcy, construction, securities, financial institutions, financial services, environmental, health, immigration, intellectual property, international tax, litigation, technology, real estate law and tax law.

### III. NATURE OF THE CAUSE

11.     This case arises out of Amex's participation, in concert, with the now defunct law firm Jenkens, in a conspiracy to market, sell and implement illegal tax shelters from 1999 through 2003. All defendants committed wrongful acts in furtherance of the conspiracy and the subsequent cover-up activities that are ongoing.

12.     As part of the conspiracy, Jenkens referred clients and third party service providers to Goldstein at Amex to confirm the tax advice and treatment on certain illegal tax shelters including

the "Short Sale", "Short Option", "Short Swap", "HOMER", and "1256" transactions opined on by

Jenkens and then reported by Amex.

13.     JBO Trust and Ohle relied upon the Amex's respected and purportedly independent

tax preparation.   Unbeknownst to the Plaintiffs, Jenkens was paying, in the form of fees,

commissions, kickbacks and/or bribes over $350,000.00 for the referrals it was sending to Amex to

insure that Amex and its partners and employees allowed the tax losses to go through their

accounting "safeguards" and having Amex partners and employees sign off that "substantial

authority" existed for the losses to be properly deducted for IRS purposes.

## IV. BACKGROUND

14.     In December 1999, Ohle resigned from KPMG LLP's Washington National Tax

office to accept the position of Regional Director of Bank One's Financial Planning Group in

Chicago.

15.     In January, 2000, Ohle's supervisor at Bank One's Financial Planning Group, Trey

Dye, introduced Ohle to Paul Daugerdas, a partner of Jenkens, at the Fountainebleau Hotel in Miami

Beach, during the annual Heckerling Institute on Estate Planning.

16.     Jeff Conrad was hired later in 2000 as an employee of Bank One's Financial Planning

Group which was renamed the Innovative Strategies Group ("ISG") by Dye.

17.     Conrad described an estate planning strategy to Ohle and Dye which used a grantor

retained remainder trust as part of an estate tax transaction designed to shift future appreciation to

a family limited partnership while also providing a stepped up basis in the client's assets.

18.     Dye organized a meeting with Ernst & Young and others to review Conrad's estate

planning strategy.  Accordingly, Dye scheduled a meeting with Daugerdas and John Beery ("Beery")

at Jenkens to describe the estate planning strategy because Jenkens had a "tremendous marketing

platform in place to help promote the transaction".

19.     At the prearranged meeting, Conrad detailed the estate planning strategy to Daugerdas and Beery at Jenkens' office in Chicago. Jenkens concluded that the estate planning strategy was attractive because it was not covered by Notice 2000-44 or any other listing requirements. However, Jenkens did not believe it was particularly marketable, in that it required the taxpayer to engage in the transaction prior to selling the asset giving rise to the gain.

20.     As a result, Jenkens reworked the estate planning strategy into one that could be used to generate a loss to offset gains that had already occurred, even those involving ordinary income. This newly created transaction was named HOMER by Jenkens.

21.     On or about April, 2001, Dye invited Daugerdas to address Bank One's ISG members in Columbus. At the meeting, Daugerdas rolled out the HOMER transaction. See executive summary of HOMER attached as Exhibit "1".

22.     Following that meeting, Vicky Little, a Regional Director for Bank One's ISG, referred Chuck Bolton and Belle Six of the Bolton Capital Group to Jenkens to act as the third party purchaser due to related party tax issues.

23.     Because the ISG members were told by Jenkens and Bank One that the HOMER transaction was not a tax shelter, the ISG members became concerned when Daugerdas mentioned David Smith, a former tax shelter promoter, as a third party purchaser. In order to resolve this concern, Daugerdas recruited Ohle to introduce a thirty party purchaser. See Exhibit 2 for Jenkens' Memorandum on Tax Shelter Registration.

24.     Ohle introduced Ken Brown, a childhood friend, to Daugerdas in or about June, 2001. Brown and his wife, Denise Davilla, become clients of Jenkens and participated in the HOMER transaction through corporate entities formed by Jenkens on their behalf.

25.     In mid-November 2001, Jenkens and White & Case, counsel for Deutsche Bank, changed the HOMER transaction to include a unsecured note for the purchase of the unitrust interest. See Item 7 in Exhibit 1.  Ohle raised an objection about having a client sell its unitrust interest for an unsecured note since the Browns' entities were unfunded and not capitalized.

26.     In order to resolve this concern, Daugerdas recruited Ohle to find funding for the Browns. Ultimately, Jenkens agreed to pay Douglas Steger for funding the Browns' entities so that the unitrust interests could be purchased for cash.

27.     In early 2002, Brown met Jenkens in conjunction with wrapping up the HOMER transactions. Upon information and belief, in that meeting, Beery introduced a transaction promoted by Royal Bank of Canada (the "1256 transaction") to Brown as a manner of avoiding income tax on his HOMER earnings.

28.     Ultimately, the 1256 transaction was invested in by more than eighty (80) clients, including the JBO Trust, Brown and Steger.

29.     Daugerdas referred Ohle to Amex for tax preparation, describing Goldstein as an outstanding accountant familiar with complex tax issues such as the 1256 transaction.

30.     Daugerdas also referred Brown to Goldstein and Amex for the preparation of the corporate entities used in HOMER as well as the Browns' individual tax returns.

31.     Steger and a number of HOMER clients, including, but not limited to, Donald Wilson and David Ducote were also referred to Goldstein and Amex.

32.     Amex prepared 2002 income tax returns for JBO Trust (which items of income or loss were reported on Ohle's return due to the trust's grantor trust status), Ohle, Brown and Steger reflecting the tax losses from the 1256 transactions.

33.     JBO Trust and/or Ohle relied upon Amex and its tax and accounting experience and/or alleged expertise to file accurate and complete income tax returns from 2001 through 2006. Amex also filed all required disclosure forms for Ohle on the 1256 transaction. Goldstein was also engaged by Ohle to provide a thorough response to the IRS upon his resulting income tax audit.

34.     On November 14, 2008, Ohle was indicted for tax conspiracy related to the filing of the three 2002 individual income tax returns prepared by Amex for Ohle, Brown and Steger, as well as tax fraud for illegally reporting tax losses related to the 1256 transaction.

35.     In June, 2010, after a three week trial, Ohle was convicted on all counts after false testimony by Goldstein and Anderson which covered up Amex's long-standing conspiracy with Jenkens in tax related transactions. Further, Amex hid and/or destroyed certain tax files detailing the conspiracy and/or relevant transactions.

36.     After the trial, Ohle discovered that the Government had failed to produce 116 boxes of evidence prior to trial.  In that evidence, the long standing conspiracy between Jenkens and Amex was exposed.  See Jenkens' email as example of relationship at Exhibit 3.  In fact, Goldstein and Jenkens' partner, Erwin Mayer, executed confidentiality agreements predating their employment with Jenkens and Amex.  See Exhibit 4.  Further, Goldstein was a client of Jenkens and participated in tax shelter investments personally.  See Exhibit 5.

Jenkens disclosed paying Amex $109,350.00 in 1999 in response to the IRS' Information Document Request in regard to a tax shelter promoter audit of Jenkens.  Additionally, another $339,945.50 was paid by Jenkens to Amex between 1999-2002.  See Exhibit 6.  In fact, the IRS subpoenaed Amex's records for every client whose tax return was based on advice of Jenkens.  An indication of this conspiracy between Jenkens and Amex is demonstrated in that email at Exhibit 7.

V.

FIRST CAUSE OF ACTION:
CIVIL VIOLATIONS OF THE RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT

37.  The allegations contained in paragraphs 1 through 36 of this Complaint are incorporated herein by reference.

38.  Plaintiffs are a "person" within the meaning of 18 U.S.C. 1964(c).

39.  At all times relevant hereto, Plaintiffs and each Member of the Enterprise were "persons" within the meaning of 18 U.S.C. 1961(3).

The RICO Enterprise

40.  An enterprise need not be a specific legal entity but rather be "any union or group of individuals associated in fact although not a legal entity."

41.  The enterprise at issue in this case, for purposes of 18 U.S.C. 1961(3) and 1962(a), 1962(b), 1962(c) and 1962 (d), is an association-in-fact of all unnamed co-conspirators and Defendants - "Members of the Enterprise" - collectively referred to herein as "the Enterprise." The wrongdoers that were part of the association-in-fact Enterprise include Defendants, banking institutions and investment associations, law firms that issued the opinions, accountants that reviewed the strategies and accountants that drafted the Plaintiffs' applicable tax returns, as well as those employees and agents of Members of the Enterprise and other non-defendant entities that participated in the unlawful and undisclosed fee sharing. In fact, at times throughout the years that the Enterprise conducted these schemes, the number of Members conspiring and colluding in the Enterprise fluctuated because the Enterprise would newly solicit some additional co-conspirators and discharge others, in order to increase profitability.

42.   While Defendants participated in the Enterprise and were a part of it, Defendants also have an existence separate and distinct from the Enterprise.

43.   Defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

44.   Defendants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme.

45.   The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

46.   Defendants and all other Members of the Enterprise shared fees, costs, information, resources, and the fruits of its predicate acts.  The association-in-fact Enterprise, composed of Defendants and other Members of the Enterprise, was a formal, ongoing relationship which functioned as a continuing unit, pursuing a course of conduct as set forth above (i.e., the pursuit of customer prospects, the promotion and the sale of the series of tax strategies and, importantly, the sharing of fees), with a common or shared purpose (i.e., to convince potential clients that the strategies would decrease or eliminate those clients' tax liabilities when in fact they would not, all the while charging exorbitant fees for the shared benefit of the Members of the Enterprise) and continuity of structure and personnel (including partners, associates and support staff).

47.   Defendants and those employed by and/or associated with the Enterprise, which engaged in interstate commerce, have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(a) and (b), and have conspired to violate 1962(c) in violation of 1962(d) by pursuing and soliciting clients, designing, creating, engineering, implementing, marketing, promoting and/or selling and inducing the purchase of transactions which were designed to reduce or eliminate tax liability and which were determined by the IRS to be illegal and/or abusive

tax shelters under IRS Notices and/or Announcements.

48. Defendants have violated 18 U.S.C. 1962(d), inasmuch as they knowingly, intentionally and unlawfully, aided and abetted each other and the Enterprise and conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise, through the pattern of racketeering activity described herein.

The Scheme

49. As set forth hereinabove, for a substantial period of time, Members of the Enterprise knowingly, intentionally and directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in the pursuit of and solicitation of and eventual inducement of clients and third party service providers for the purpose of obtaining exorbitant fees which were shared amongst the co-conspirator Members of the Enterprise.

50. The particulars of the scheme as set forth above were achieved by means of false or fraudulent representations or promises and through through the use of the mails and/or wires.

Predicate Acts

51. With respect to the activities alleged herein, the Enterprise acted at all times with malice toward the Plaintiffs, with the intent to engage in the conduct complained of for the monetary benefit of Defendants and other Members of the Enterprise. Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs. The predicate acts were acts of deception which furthered the goal of soliciting clients to pay for the participation in what the Enterprise knew or should have known was a fraudulent tax shelter transaction which would be deemed abusive by the IRS and the subsequent ongoing cover up of these illegal activities.

52. With respect to the activities alleged herein, the Enterprise sought to aid and abet and actually did aid and abet a transaction to violate 18 U.S.C. 1962(a), (b) and (c). Each Member of

the Enterprise, including Defendants, agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and actually obtaining fees to which Defendants and other Members of the Enterprise were not entitled.

53.   With respect to the overt acts and activities alleged herein, each member of the Enterprise conspired with each other co-conspirator or entity to violate 18 U.S.C. 1962(a), (b) and (c), all in violation of 18 U.S.C. 1962 (d).   In violation of 1962(c), each Member of the Enterprise agreed and conspired with each other Member to:  a) pursuant to 1962(a), invest fees paid by Plaintiffs into pursuing and soliciting other clients, inducing and causing other individuals and business entities to pay for the tax advice at issue; and b) pursuant to 1962(b), acquire or maintain property interests to which the Enterprise was not entitled through racketeering activity which included charging and sharing exorbitant fees for tax strategies it knew or should have known would be deemed unacceptable by the IRS.

54.  The Enterprise and its individual Members exceeded any legitimate role of diligent tax advisers by designing, creating, engineering, implementing, marketing, promoting and/or selling a series of these tax strategies in an attempt to conspire to obtain money in the form of fees, commissions, kickbacks and/or bribes, knowing that the underlying strategies were likely not defensible to the IRS.

55.  The Enterprise was in the best position to know that these strategies were potentially illegal and/or abusive and yet charged the exorbitant fees anyway.  The Enterprise knew, should have known, and was in the best position to know that these strategies would not withstand the challenge and/or scrutiny of the IRS.

56.  The Enterprise's schemes have resulted in severe financial, business, reputational and personal losses to the Plaintiffs. Moreover, as a result of the Enterprise's wire fraud, mail fraud and

general fraud violations, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Enterprise, and enormous legal fees associated with the criminal charges resulting from the Enterprise's activities.  Further, Ohle has suffered damages, as a result of his conviction and incarceration, in the form of past, present and future loss of earnings, reputational damage, embarrassment and humiliation, severe mental and emotional distress and any other damages related thereto due the Enterprise's activities and fraudulent actions which are recoverable under federal or state law, including, but not limited to attorneys' fees and punitive and/or exemplary damages where applicable.

57.  The Enterprise's documents and communications, including Goldstein and Anderson's testimony at Ohle's trial, associated with the schemes at issue contained false, misleading representations and/or purposely omitted facts.

58.  These misrepresentations constitute "false or fraudulent pretenses, representations or promises" within the meaning of the mail fraud (18 U.S.C. 1341) and wire fraud (18. U.S.C. 1343) provisions.

59.  All of the Members of the Enterprise, including Defendants herein named and others who are not named as defendants to this matter, actively participated in this elaborate and abusive scheme to obtain money from clients of the Enterprise, including the Plaintiffs and Ohle's clients and associates.

60.  The numerous predicate acts of mail and wire fraud described herein are part of separate fraudulent transactions by the Enterprise designed to defraud the Plaintiffs and Ohle's clients and associates of money and property interests under false pretenses and cover up the Enterprise's illegal activities.  As the victims of these unlawful patterns of illegal behavior, Plaintiffs have continued to suffer losses.

61. In carrying out the overt acts and fraudulent transactions described herein, the Enterprise engaged in conduct in violation of various state and federal laws and regulations, including, but not limited to, 18. U.S.C. 1341, 1343, 1346 and 1961 et seq.

62. 18 U.S.C. 1961(1) provides that "racketeering activity means any act indictable under any of the following provisions of Title 18, United States Code: 1341 (relating to mail fraud), 1343 (relating to wire fraud) and 1346 (relating to scheme to artifice to defraud).

Violations of 18 U.S.C. Sections 1341 and 1343

63. For the purposes of executing and/or attempting to execute its transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. 1341, placed in post offices and/or in authorized repositories for mail, matter and things to be sent or delivered by the Postal Service and receive matter and things therefrom including but not limited to contracts, instructions, correspondence, opinion letters, checks and other items.

64. For the purpose of executing and/or attempting to execute its transaction to defraud and obtain money by means of false pretenses, representations or promises, the Enterprise, in violation of 18 U.S.C. 1343, transmitted and received by wire, matter and things therefrom, including but not limited to contracts, instructions, correspondence, opinion letters, funds and other things.

65. The Enterprise's use of the mails and wires includes private and public components.

66. The Members of the Enterprise utilized the U.S. Mail and wire to communicate among themselves, as well as with their co-conspirators and clients.  Defendants lived and worked in Illinois while soliciting clients nationwide, including, JBO Trust in Louisiana.  In order to carry out and implement its scheme, the Enterprise necessarily had to communicate using the interstate mails and wires.

67. In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, the Enterprise falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs, in violation of 18 U.S.C. 1341 and 1343.

68. The Enterprise intentionally and knowingly made these misrepresentations and intentionally and knowingly made these misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs for the purpose of deceiving them and thereby obtaining financial gain. The Enterprise either knew, should have known or recklessly disregarded that the misrepresentations and omissions in carrying out the transactions, subsequently filing their tax returns and in paying unnamed co-conspirators and Defendants.

69. Plaintiffs have therefore been injured in its property, person and/or businesses by the Enterprise's overt acts and racketeering activities.

Pattern of Racketeering Activity

70. The violations set forth herein constitute "racketeering activities" or "predicate acts" within the meaning of 18 U.S.C. 1961(1).

71. The Enterprise has engaged in a "pattern of racketeering activity," as defined in 1961 of RICO, by committing and/or conspiring or aiding and abetting a transaction with at least two such acts of racketeering activity, as described specifically herein, within the past ten years. Upon information and belief, each of the Members of the Enterprise and its co-conspirators have committed at minimum fifty (50) acts of racketeering activity. Each act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting similar victims, including Plaintiffs herein.

72. These predicate acts are related in the sense that they have the same purpose (to carry out the scheme described herein); result (to obtain money); victims (Plaintiffs and many others);

method of commission (the scheme described herein); and are otherwise interrelated by distinguishing characteristics and are not isolated events, because they were carried out for the same purpose.

73. The predicate acts were committed in the same manner, and they constituted the Enterprise's "normal" way of doing business with regard to pursuing and soliciting clients, inducing them to participate, purporting to provide "independent" verification of the tax strategies and then reporting the tax losses.

74. The related predicates amount to a continued criminal activity because they extended over a substantial period of time.

75. The Enterprise's course of action entails a span of years, during which Defendants committed numerous, related predicate acts, as set forth specifically herein, as part of its continuing scheme. Also, the predicate acts are closely intertwined as far as actors, goals, nature, functioning and structure of the operations described herein in the persecution of Plaintiffs and the Enterprise's other victims.

76. The multiple acts and the continuity and relatedness of racketeering activity committed and/or conspired to or aided and abetted by unnamed co-conspirators and Defendants, as described herein, were related to each other, amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. 1961(5).

SECOND CAUSE OF ACTION:

ACCOUNTING MALPRACTICE (against all Defendants except Jenkens)

77. The allegations contained in paragraphs 1 through 76 of this Complaint are incorporated herein by reference.

78. The Amex Defendants acted as Plaintiffs' accountants and tax return preparers. They owed Plaintiffs a duty to represent them with such reasonable skill, care and diligence as members of the accounting profession commonly posses and exercise in similar situations.

79. Throughout their engagements, in the instant transaction, the Amex Defendants represented that they had a high level of experience in providing tax advice and that they were competent to perform all the necessary services for Plaintiffs and others in compliance with the applicable professional standards and the reasonable skill, care and diligence that members of the accounting profession commonly possess and exercise in similar situations.

80. At all times, Plaintiffs relied on the Amex Defendants to perform all of their material obligations with the requisite skill, expertise and integrity that one would expect from such a prominent accounting firm.

81. At all relevant times, the Amex Defendants owed a duty to Plaintiffs to exercise due care while performing services and functioning as Plaintiffs' accountants.

82. At all relevant times, the Amex Defendants owed a duty to Plaintiffs to operate without a conflict between the interests of Plaintiffs and the Amex Defendants" own pecuniary interests. At the very least, this conflict should have been disclosed to Plaintiffs and was not.

83. The Amex Defendants breached their duties to Plaintiffs by the conduct alleged hereinabove. Said Defendants also failed to register themselves as tax promoters in violation of federal statutes and regulations.

84. Additionally, the Amex Defendants failed to adopt or implement adequate controls to protect their clients from wrongdoing and negligence by Amex personnel.

85. The Amex Defendants had a continuing duty to correct their past erroneous tax advice.

86. The services the Amex Defendants provided to Plaintiff were deficient, inadequate and not competent, and were not subject to the appropriate supervisory controls.   These Amex Defendants fell below the standard of care exercised by accountants engaged to provide tax advice and tax return preparation.

87.   Plaintiffs fully performed their obligations to the Amex Defendants under their agreements with them.

88.   As a direct and proximate result of the Amex Defendants' breach of their duties and professional negligence, Plaintiffs have suffered and will continue to suffer severe financial, business, reputational and personal losses to the Plaintiffs.   Moreover, as a result of the Amex Defendant's accounting malpractice, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Amex Defendants, and enormous legal fees with the criminal charges resulting from the Amex Defendant's activities.   Further, Ohle has suffered damages as a result of his conviction and incarceration in the form of past, present and future loss of earnings, reputational damage, embarrassment and humiliation, severe mental and emotional distress and any other damages which are recoverable under federal or state law due to the Amex Defendant's activities and accounting malpractice.

THIRD CAUSE OF ACTION:

BREACH OF CONTRACT, NEGLIGENT REPRESENTATION AND BREACH OF FIDUCIARY DUTY (against all Defendants except Jenkens)

89.   The allegations contained in paragraphs 1 through 88 of this Complaint are incorporated herein by reference.

90.   The Plaintiffs and the Amex Defendants entered in valid and enforceable oral and/or written contracts pursuant to which the Amex Defendants agreed to provide the Plaintiffs with

professionally competent tax advice, accounting services and tax return services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all rules of professional conduct and in return, the Plaintiffs agreed to pay Amex significant fees for its services.

91.  The Amex Defendants were Plaintiffs' fiduciaries, and, as such, owed Plaintiffs the duties of honesty, loyalty, care and compliance.

92.  The Amex Defendants represented themselves as having specialized expertise and superior knowledge of tax laws and tax shelter registration rules and solicited the Plaintiffs and Ohle's clients and associates to trust them as experts in these areas.

93.  The Plaintiffs did in fact repose complete trust and confidence in the Amex Defendants and relied on the Amex Defendants for guidance and to protect their financial interests.

94.  Independently of JBO Trust and Ohle, the Amex Defendants were engaged by Brown and Steger.  The Amex Defendants can not and should not have implied, implicitly or explicitly, that Ohle had any responsibility for the tax returns prepared by the Amex Defendants and signed by Brown and Steger.

95.  The Amex Defendants breached its contract with Plaintiffs by not providing competent, independent tax advice.  This failure to provide competent advice in conjunction with the false testimony directly led to the criminal charges in the 1256 transaction against Ohle.

96. The Amex Defendants negligently represented Plaintiffs by allowing Plaintiffs to engage in and then report the tax losses from the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions and opinions, which the Enterprise knew or should have known to be improper and illegal.

97.  The Amex Defendants breached their fiduciary duties to Plaintiffs by advising Plaintiffs to engage in and then report the tax losses from the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise in reliance on its advice, representations, recommendations, instructions and opinions, which the Amex Defendants knew or should have known to be improper and illegal.

98.  The Amex Defendants breached its fiduciary duties to Plaintiffs by not maintaining its tax workpapers as required and making material misrepresentations to cover up its illegal activities.

99.  The Amex Defendants breached its fiduciary duties to Plaintiffs by committing the acts and/or omissions set forth above.

100.  As a result of the conduct set forth herein, the Enterprise's schemes have resulted in severe financial, business, reputational and personal losses to the Plaintiffs.  Moreover, as a result of the Amex Defendants breach of contract, negligent representation and breach of fiduciary duties, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Amex Defendants and enormous legal fees associated with the criminal charges resulting from the Amex Defendant's activities.  Further, Ohle has suffered as a result of his conviction and incarceration damages in the form of past, present and future loss of earnings, reputational damage, embarrassment and humiliation, severe mental and emotional distress and any other damages which are recoverable under federal or state law including, but not limited to, attorneys' fees and punitive and/or exemplary damages where applicable due to the Amex Defendants breach of contract, negligent representation and breach of fiduciary duty.

FOURTH CAUSE OF ACTION:

FRAUD

101.    The allegation contained in paragraphs 1 through 100 of this Complaint are incorporated herein by reference.

102.    The Enterprise made false and misleading statements in violation of the laws of the United States and the States of Louisiana and Illinois as set forth herein.

103.    The Enterprise made misrepresentations to the Plaintiffs herein for the purpose of inducing Plaintiffs and other clients and associates of Ohle to participate in its schemes and to pay the Enterprise large sums of money.

104.    In order to induce the Plaintiffs and other clients and associates of Ohle to pay its exorbitant fees, the Enterprise made numerous knowingly false affirmative representations and intentional omissions of material facts to Plaintiffs and other clients and associates of Ohle including but not limited to those acts and/or omissions set forth above.

105.    The above intentional omissions of material fact and/or affirmative representations made by the Enterprise and its unnamed co-conspirators were false when made and the Enterprise knew or should have known these representations to be false when made with the intention that Plaintiffs and other clients and associates of Ohle rely on them in deciding whether or not to take the advice of the Enterprise and thereby pay it exorbitant fees and commissions.  In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Enterprise with the intent to induce Plaintiff and other clients and associates of Ohle to enter the abusive tax strategies and pay its exorbitant fees.

106.   In reasonable reliance on the Enterprise's false affirmative representations and intentional omissions of material facts regarding the transactions at issue, Plaintiffs and other clients and associates of Ohle paid to the Enterprise fees to execute the transactions, did not avail themselves of alternative tax opportunities, filed federal and state tax returns that have been deemed to be criminal for reflecting improper deductions for capital and ordinary losses from the transactions, and filed a disclosure statement prepared by the Amex Defendants that was deemed deficient by the Government.

107.   But for the Enterprise's intentional misrepresentations and material omissions described herein, Ohle would have never referred clients and associates to the Enterprise, would never had filed and signed federal and state tax returns claiming the deductions for capital and ordinary losses from the transactions and/or failed to avail himself of other alternative tax opportunities.

108.   After discovering the Enterprise's fraud, Plaintiffs have suffered severe financial, business, reputational and personal losses.  Moreover, as a result of the the Enterprise's fraud, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Enterprise, enormous legal fees associated with civil lawsuits related to the Enterprise's activities as well as criminal charges against Ohle resulting from the Enterprise's activities, and substantial losses to Ohle's businesses.  Further, Ohle has suffered damages as a result of his conviction and incarceration in the form of past, present and future loss of earnings, reputational damage, embarrassment and humiliation, severe mental and emotional distress and any other damages recoverable under federal or state law, including, but not limited to, attorneys' fees and punitive and/or exemplary damages where applicable due to the Enterprise's activities and fraudulent actions.

FIFTH CAUSE OF ACTION:

CIVIL CONSPIRACY

109.   The allegations contained in paragraphs 1 through 108 of this Complaint are incorporated herein by reference.

110.  As described more fully herein, the Enterprise and its Members, including Defendants knowingly acted in concert to obtain exorbitant fees from Plaintiffs and others similarly situated.

111.   The Enterprise and its Members, including Defendants acted as described herein according to a predetermined and commonly understood and accepted plan of action, all for the purposes of obtaining exorbitant professional fees from clients, including Plaintiffs.

112.  The acts of the Enterprise were contract to numerous provisions of law, as stated herein.

113.   There was a meeting of the minds between and among the Defendants and other Members of the Enterprise, both known and unknown, to commit the unlawful acts alleged herein. This conspiracy to commit these unlawful, overt acts proximately caused and continued to cause Plaintiffs damages as set forth herein.

114. As a result of the conduct of Members of the Enterprise including Defendants, Plaintiffs suffered severe financial, business, reputational and personal losses.  Moreover, as a result of the Enterprise's civil conspiracy, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Enterprise, enormous legal fees associated with civil lawsuits related to the Enterprise's activities as well as criminal charges against Ohle resulting from the Enterprise's activities, and substantial losses to Ohle's businesses.  Further, Ohle has suffered damages as a result of his conviction and incarceration in the form of past, present and future loss of earnings, reputational damage, embarrassment and humiliation, severe mental and emotional distress and any other damages recoverable under federal or state law , including, but not

limited to, attorneys' fees and punitive and/or exemplary damages where applicable due to the Enterprise's civil conspiracy.

SIXTH CAUSE OF ACTION:

DECLARATORY JUDGMENT AND UNJUST ENRICHMENT

    115.  The allegations contained in paragraphs 1 through 114 of this Complaint are incorporated herein by reference.

    116.  An actual, justiciable controversy exists between Plaintiffs on the one hand and the Defendants and other Members of the Enterprise on the other.

    117.  Had the Plaintiffs not been pursued, solicited and enticed to refer clients and associates to the Enterprise to engage in the tax strategies designed, created, engineered, implemented, marketed, promoted and/or sold by the Enterprise, they would not have paid fees to Defendants and other Members of the Enterprise nor would they have incurred the expenses and damages associated with such transactions.

    118.  The payment of fees to the Enterprise, including named Defendants and other unnamed co-conspirators, enriched Defendants and other unnamed co-conspirators and was to the detriment of Plaintiffs.

    119.  Plaintiffs seek a declaration that, due to the foregoing lack of consideration, the Enterprise has been unjustly enriched and all fees paid to the Enterprise, including but not limited to fees paid to Defendants, should be returned to Plaintiffs.

    120.  Plaintiffs also seek a judgment declaring each defendant liable jointly and in solido with all unnamed co-conspirators for all damages sustained.

    121.  Finally, Plaintiffs seek an award of costs and reasonable and necessary attorneys' fees as are equitable and just.

SEVENTH CAUSE OF ACTION:

VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES ACT

AND THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

122.    The allegations contained in paragraphs 1 through 121 of this Complaint are incorporated herein by reference.

123.    The Enterprise engaged in unfair and deceptive business acts and practices described above, in violation of La. R.S. 51:1409 of the Louisiana Unfair Trade Practices Act ("LUTPA") and Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

124.    The Enterprise's unfair and deceptive acts and practices occurred in the conduct of trade and commerce, including offering professional services related to the offering of illegal tax shelter products.

125.    The Enterprise used or employed deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission of material facts with intent that the Plaintiffs rely upon the misrepresentation, concealment, suppression or omission of such material facts.

126.    The Enterprise's actions were taken with actual or deliberate intention to harm Plaintiffs, or if not intentional, with an utter indifference to or the conscious disregard for the injury to Plaintiffs.

127.    The Enterprise's unfair and deceptive acts and practices cause Plaintiffs substantial damages in the form of severe financial, business, reputational and personal losses.  Moreover, as a result of the Enterprise' violations of LUTPA and Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiffs have suffered extensive monetary damages consisting of unexpected tax

liabilities, fees and commissions paid to the Enterprise, enormous legal fees associated with the civil lawsuits and criminal charges associated with the Enterprise's deceptive business practices, and substantial losses to Ohle's businesses.  Further, Ohle has suffered damages in the form of past, present and future loss of earnings, reputational damages, embarrassment and humiliation, severe mental and emotional distress and any other damages recoverable under federal or state law including, but not limited to, attorneys' fees and punitive and/or exemplary damages where applicable due to Enterprise's deceptive business practices.

128.  Defendants' actions occurred in the course of conduct involving trade or commerce within the States of Louisiana and Illinois, namely the marketing and implementation of tax advice and implementation.

129.  Both LUTPA and Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(c), allow this Court to award attorney's fees and costs to prevailing Plaintiffs.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that, after all due proceedings, the Court enters judgment:

a.  As to the RICO claim, a judgment in favor of Plaintiffs and against each Defendant, jointly and severally, and in solido, with all unnamed co-conspirators, for actual damages in an amount to be proven at trial, plus treble damages, attorneys' fees, interest and costs;

b.  declaring that the Amex Defendants breached their duties as professional accountants by committing malpractice;

c.  declaring that the Amex Defendants breached their contractual obligations to the Plaintiffs, were negligent in their representations to the Plaintiffs and breached their fiduciary duties to the Plaintiffs;

d.  declaring that the Defendants are liable to the Plaintiffs for fraud in the misrepresentations and intentional omissions of materials facts made knowingly by the Enterprise;

e.  declaring that the Defendants are liable to the Plaintiffs for the civil conspiracy;

f.  declaring that the Defendants were unjustly enriched and ordering that the Defendants must forfeit and disgorge their fees;

g.  declaring that Defendants engaged in unfair and deceptive businesses acts and practices;

h.  awarding the Plaintiffs all damages in the form of financial, business, reputational and personal losses.  Moreover, awarding the Plaintiffs monetary damages consisting of unexpected tax liabilities, fees and commissions paid to the Enterprise, legal fees associated with civil lawsuits and criminal charges associated with the Enterprise's activities and substantial losses to Ohle's businesses;

i.  awarding Plaintiff Ohle monetary damages in the form of past, present and future loss of earnings, reputational damages, embarrassment and humiliation, severe mental and emotional distress and any other damages recoverable under federal or state law including, but not limited to, attorneys' fees and punitive and/or exemplary where applicable due to the Enterprise's aforementioned conduct; and

j.  granting such other and further relief which the Court deems necessary and proper at law and in equity.

Respectfully submitted,

Dennis Rinck (#32653)
Rivertown Law Center, LLC
525 Clay Street
Kenner, Louisiana 70062
Telephone(504) 704-1194/Fax(504) 364-9366
Counsel for Plaintiffs

**_PLEASE SERVE_:**

American Express Tax and Business Services, Inc.
a/k/a RSM McGladrey, LLC, through its counsel of record:
Lynne Uniman
Andrew Kurth, LLP
450 Lexington Ave
New York, NY 10017